UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

NANCY A. HARRISON,

                                    Harrison,

v.

WELLS FARGO BANK, N.A.                          Civil Action No. 3:13–CV–279

and

WELLS FARGO AND COMPANY
DISABILITY PLAN,

                                    Defendants.

## **MEMORANDUM OPINION**

THIS MATTER is before the Court on a Motion for Summary Judgment ("Motion") (ECF No. 12) submitted by Defendants Wells Fargo Bank, N.A. and Wells Fargo and Company Short-Term Disability Plan (collectively, "Wells Fargo"). Plaintiff Nancy A. Harrison ("Harrison") filed a two-count Complaint against Wells Fargo alleging that their denial of short-term disability ("STD") benefits violated the provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"). The Motion was fully briefed and a hearing was held on October 31, 2013. For the reasons stated below, the Court GRANTS the Motion.

## I.      BACKGROUND

The material facts in this case are undisputed and are taken from the parties' memoranda and the administrative record.[1] As such, summary judgment is appropriate if Wells Fargo is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

---

[1] Although the parties dispute several issues, those issues do not concern material facts that would render summary judgment inappropriate. *See* Fed. R. Civ. P. 56(a). First, the parties dispute whether the Wells Fargo and Company Short-Term Disability Plan requires an employee to be unable to perform all, or merely some, essential job duties in order to be eligible for STD payments. This dispute does not concern a material fact, however, because Wells Fargo concluded that Harrison failed to show she was unable to perform any essential function and because contract

1

A. THE PARTIES AND THE PLAN

Harrison was hired by Defendant Wells Fargo, N.A., as an Online Customer Service Representative in October of 2008. In her position, Harrison was responsible for assisting customers with online financial products and services, as well as processing online transactions. The Job Description Form for Harrison's position describes three "primary job function[s] . . . intrinsic to the position": (1) answering and responding to customer service calls using phone and computer; (2) assisting with tasks such as answering customer emails in between calls; and (3) cross-selling other Wells Fargo products. (Admin. R. WF-1000177). Harrison's position was sedentary and primarily involved sitting, using a keyboard and mouse, and handling irate customers in a calm and professional manner, as well as occasional walking, bending or twisting at the neck, pushing, pulling, and handwriting. Harrison was required to work shifts of ten hours, four days per week, in a fast paced environment subject to a specific schedule for lunches and breaks.

Through her employment, Harrison participated in the Wells Fargo and Company Short-Term Disability Plan ("Plan"), which qualifies as an employee welfare benefit plan within the meaning of ERISA. Wells Fargo and Company is the Plan Sponsor and the Plan Administrator. Wells Fargo Bank, N.A., appears to be the Plan Trustee. Under the Plan, Wells Fargo and Company retains full discretionary authority to administer and interpret the Plan's terms.

The Plan's terms appear in a Benefits Book, which includes several provisions relevant to the Motion. First, introductory language to "Chapter 9: Short-Term Disability Plan" is given under the heading, "The Basics," and includes the following statement:

> The Short-Term Disability (STD) Plan provides you with salary replacement if you have a medically certified health condition and are unable to perform *some or all of your job duties* for more than seven consecutive calendar days (the "STD waiting period"). (Please review the definition of "Medically certified health condition" on page 9-6.)

---

interpretation is generally a question of law, appropriately decided by the Court on a motion for summary judgment. *Scarborough v. Ridgway*, 726 F.2d 132 (4th Cir. 1984). Second, the parties dispute whether Wells Fargo, N.A. is an appropriate defendant. This dispute similarly does not concern a material fact because, regardless of the appropriate defendant, denial of Harrison's claim for benefits was not an abuse of discretion under the Plan.

(Admin. R. WF-1000451 (emphasis added)). The referenced pages defined a medically certified

health condition as

> a disabling illness or injury that:
> - Is documented by clinical evidence as provided and certified by an approved care provider. Clinical evidence may include medical records, medical test results, physical therapy notes, mental health records, and prescription records.
> - Prevents you from performing *the essential functions of your own job* as regularly scheduled for longer than the STD waiting period.

(Admin. R. WF-1000454 (emphasis added)). Additionally, the Plan elsewhere states that "[t]o

qualify for STD benefits, you must . . . [h]ave a medically certified health condition that lasts

longer than the STD waiting period and prevents you from performing *the essential duties of*

*your job.*" (Admin. R. WF-1000454 (emphasis added)).

Pursuant to the Plan, Harrison's eligibility for STD benefits affected her eligibility for

other benefits. Specifically, the Plan provides that long term disability benefits may only be

applied for after 26 weeks of STD benefits have been exhausted. The Plan also provides that

additional STD benefits may be available if a new condition develops while a Plan participant is

on an approved medical leave.

Defendant Wells Fargo & Company, as the Plan Administrator, has designated Liberty

Life Assurance Company of Boston ("Liberty") as the claims administrator for the Plan. In its

role as claims administrator, Liberty is charged with initial and continuing approval or denial of

STD benefits. Once a STD is denied, Liberty handles the first appeal and the second appeal is

made to the Wells Fargo Short Term Disability Appeal Committee ("Committee"), which

appears to operate as an entity with Wells Fargo and Company. The Plan indicates that

administrative remedies are exhausted after an unsuccessful appeal to the Committee,

procedurally authorizing suit pursuant to section 502(a) of ERISA.

B. HARRISON'S MEDICAL TREATMENT

Harrison's medical problems first arose on May 11, 2011, when she sought emergency care for chest pains. She was admitted to a hospital overnight where treating physicians discovered a mass in Harrison's chest cavity. Harrison followed up with her primary care physician, Dr. Mark Petrizzi, the following day, and further testing revealed that the mass was an enlarged thyroid existing in Harrison's neck and extending into her chest cavity.

Harrison's last day of work was June 8, 2011, and on June 9, 2011, Harrison underwent a bronchoscopy which revealed that the mass was comprised of thyroid tissue and caused significant tracheal compression. This revelation prompted Dr. Petrizzi, in a follow up visit on June 15, 2011, to recommend that Harrison not return to work until "surgery for [the] thyroid mass is complete." (Admin. R. WF-1000163).

On June 21, 2011, Harrison was seen by an ear, nose, and throat specialist, Dr. Daniel VanHimbergen. Dr. VanHimbergen noted that Harrison had airway symptoms and difficulty swallowing and scheduled a thyroidectomy for August 17, 2011.

On August 4, 2011, prior to her thyroidectomy, Harrison visited Dr. Petrizzi complaining of depression and chest pain. Harrison's husband suddenly passed away on July 1, 2011. Dr. Petrizzi referred Harrison to a psychologist, Dr. Glenn, for treatment of her depression. Harrison also noted that her chest pain was mild to moderate, occurred at rest, and had been occurring for weeks. An electrocardiogram revealed normal sinus rhythms, and Harrison declined further testing. Notably, Harrison stated that the reason for declining further testing was that her chest pain had previously been attributed by treating physicians to the mass in her chest.

On August 17, 2011, Harrison underwent a total thyroidectomy performed by Dr. VanHimbergen, and had a follow up visit with him on August 23, 2011. The thyroidectomy was successful in removing the thyroid, but the mass in Harrison's chest could not be removed. At the follow up visit, Harrison reported chest pain, leg pain and/or swelling, shortness of breath,

4

and difficulty swallowing. Harrison's post-operative pain was described as "moderate." Dr. VanHimbergen noted that Harrison's symptoms were "slightly improved compared to preoperative" and that there were no post-operative complications. (Admin. R. WF-100228).

At a second follow up visit on September 7, 2011, Dr. VanHimbergen released Harrison into the care of Dr. Petrizzi. Dr. VanHimbergen noted again that Harrison's symptoms were slightly improved compared to her preoperative state, but that she continued to complain of chest pain, leg pain and/or swelling, shortness of breath, and difficulty swallowing. Harrison's post-operative pain was described as "mild." Finally, Dr. VanHimbergen noted that Harrison had experienced right shoulder pain since the thyroidectomy but deferred treatment to Dr. Petrizzi.

On September 9, 2011, Harrison saw Dr. Petrizzi for another follow up visit. He diagnosed her with a right rotator cuff sprain or strain and noted that she felt well with minor complaints. Dr. Petrizzi filled out a disability form, prescribed at-home physical therapy, and told Harrison to follow up as needed.

Despite the successful thyroidectomy, a mass remained in Harrison's chest, requiring a second surgery. Harrison saw Dr. Petrizzi on October 5, 2011, and complained that her chest pain, described as "discomfort," had continued despite the thyroidectomy. (Admin. R. WF-1000095). Dr. Petrizzi diagnosed Harrison with anxiety, and again referred her to Dr. Glenn for treatment of her psychological symptoms. Dr. Petrizzi also noted that he intended to "write a letter in support of [Harrison's] continued STD due to her continued chest pain." (Admin R. WF-1000095).

On October 31, 2011, Harrison underwent a sternotomy, performed by Dr. Darius Hollings. This procedure involved splitting Harrison's sternum to reach and remove the thyroid mass positioned behind it. The record indicates that all physicians to have reviewed Harrison's medical files agree that Harrison was functionally limited during recovery from the sternotomy.

C.  PROCEDURAL DISPOSITION OF HARRISON'S STD CLAIM

Harrison's request for STD benefits was approved from June 9, 2011, through September 10, 2011. The initial approval of Harrison's STD claim by Liberty was accompanied by notes indicating that Harrison was out of work, as recommended by her treating physician, because of complications with the mass found in her chest, which caused breathing and swallowing difficulty, as well as tracheal compression. Liberty extended this initial approval several times on the basis of medical notes provided to them and because Harrison's surgery was somewhat delayed by scheduling difficulties. On August 25 and September 9, 2011, Harrison informed Liberty that she would be required to have a second surgery sometime in October of 2011, to remove the remaining mass in her chest.[2] She also informed Liberty that she had developed a problem with her right arm.

On September 14, 2011, Liberty referred Harrison's STD claim to a Nurse Case Manager ("NCM") for the purpose of determining whether the doctor's notes provided to Liberty supported ongoing restrictions and limitations. The NCM, Theresa Dallas, noted that Harrison had been released to her primary care physician and that her right arm was injured. The NCM indicated that certain restrictions and limitations for use of Harrison's arm were appropriate, but these restrictions had no effect on Harrison ability to perform her job requirements. On the basis of the NCM's recommendation and the medical records provided to them, Liberty informed Harrison that it discontinued STD benefits after September 10, 2011. When told of Liberty's decision on September 16, 2011, Harrison informed Liberty that she had additionally developed psychological problems while on leave and was told to provide medical documentation of this problem in support of an appeal.

On October 19, 2011, Harrison exercised her right under the Plan to a first-level appeal with Liberty, claiming ongoing disability based on chest pain, shoulder pain, and psychological

---

[2] On October 24, 2013, Harrison informed Liberty that she wanted to file a new STD claim on the basis of her second, upcoming surgery. She was told, however, that she could not file a second STD claim unless she returned to work.

issues including depression, anxiety, and post-traumatic stress disorder.[3] Harrison submitted further medical records in support of her appeal, including a letter dated October 6, 2011, from Dr. Petrizzi that stated:[4]

> While Mrs Harrison's job requires desk work, she still contiues [sic] to have chest pain despite recent thyroid surgery. She has continued difficulty with most activities. She now, has developed significant anxiety, and will be seeing a local psychologist. All these issues have resulted in her inability to return to work.

(Admin. R. WF-1000111). Harrison did not submit any records from Dr. Glenn or another psychologist in support of her appeal; however, she did provide contact information for Dr. Glenn. Liberty referred Harrison's appeal to the same NCM, Theresa Dallas, for review. The NCM noted that Harrison's thyroidectomy resulted in "slight pre operative symptom inmprovement [sic]," and that Harrison reported "depression without abnormal physical or mental nervous findings" and "chest pain with gradual onset without any associated symptoms." (Admin. R. WF-1000004). While the NCM took note of Dr. Petrizzi's October 6th letter, she concluded that it was not corroborated by medical information, specifically pointing to Harrison's normal heart rhythm test, normal physical and mental nervous findings, normal mental status exam, and failure to pursue further work ups for reported chest pain. While the NCM noted that a thyroid nodule extended into the chest, she stated that Harrison "has" surgery for it. On the basis of these facts, the NCM recommended upholding Liberty's initial denial of STD benefits, and Liberty did so in a letter dated November 28, 2011. The letter noted that "[i]n the absence of clinical evidence that supports a level of impairment that would have prevented [Harrison] from performing the duties of [her] job, [Harrison did] not meet the definition of disability as stated in the Wells Fargo & Company Short Term Disability Plan." (Admin. R. WF-1000067).

---

[3] Harrison's claim of PTSD originated with the 2004 deaths of her children and mother in a fire. She claimed that the death of her husband on July 1, 2011, aggravated her prior psychological problems.

[4] Wells Fargo implicitly attacks the credibility of Dr. Petrizzi's note by asserting that it was written "as expressly requested by Harrison." However, in light of the fact that Liberty encouraged Harrison to seek support for an appeal from Dr. Petrizzi, it would be unjust to discount his opinion on the basis of Harrison's solicitation.

On January 27, 2012, Harrison filed a second-level appeal with the Committee and additionally provided letters of support from Dr. Darius Hollings (her thoracic surgeon), Dr. Petrizzi, and her sister. Harrison additionally submitted a letter indicating that she was on an approved medical leave of absence with Wells Fargo because of physical and emotional problems. The letter from Harrison's sister indicates that Harrison had been unable to drive or be left alone since July because of her prescribed narcotic pain medication and anxiety medication. While Harrison's sister does not distinguish between Harrison's level of impairment before and after her thoracic surgery, she notes that Harrison required assistance eating, dressing, washing her hair, and performing physical therapy, and that Harrison experienced severe chest pains and loss of mobility in her arm.

The letter from Dr. Petrizzi notes that Harrison had ongoing medical problems including recurrent chest pain and shortness of breath, but largely defers to the more detailed letter of Dr. Hollings. While Dr. Hollings's letter provides substantial information regarding Harrison's course of treatment subsequent to the denial of STD benefits, it does note that "[a]fter her initial surgery . . . she continued to have chest pain and shortness of breath with activity and when lying flat" and that a subsequent CT scan "showed residual compression below the sternum bilaterally adjacent to the superior vena cava and on the left paratracheal space." (Admin. R. WF-1000038).

To assist in its determination, the Committee arranged for two peer reviews of Harrison's file—one from a physician specializing in internal medicine and one from a physician specializing in psychiatry. Dr. Dan Gerstenblitt, the internal medicine specialist, was unable to make contact with Dr. Petrizzi, despite exchanged messages on both sides. On the basis of evidence based guidelines and lacking documentation of functional limitations, Dr. Gerstenblitt concluded that Harrison could have "continued to work in a sedentary position from September 8, 2011, until the date of her sternotomy" and that "chest pain is not a reason necessarily to be unable to work." (Admin. R. WF-1000376). Dr. A.E. Daniel, the psychiatrist, made contact with

Dr. Petrizzi, who deferred her psychiatric status to Dr. Glenn. Dr. Daniel's report notes, "[Dr. Petrizzi] stated that Ms. Harrison is under the care of Dr. Glen, psychologist, and that 'we are waiting for his release for her to return to work.'" (Admin. R. WF-1000368). Dr. Daniel did not attempt to contact Dr. Glenn, and concluded that he could not provide an opinion as to whether Harrison's psychiatric status limited her functional capacity without records or a consultation with Dr. Glenn.

On the basis of these peer reviews and the documents provided to them by Harrison, the Committee upheld Liberty's denial of STD benefits after September 10, 2011. In a letter sent to Harrison dated May 4, 2012, the Committee informed Harrison that "medical records do not indicate ongoing impairment that would preclude [her] ability to perform [her] job" and that "there is no documented evidence that [her] anxiety symptoms limited [her] functional capacity." (Admin. R. WF-1000366). On May 2, 2013, Harrison filed this Complaint pursuant to 29 U.S.C. § 1132(a) alleging that the Committee's denial of STD benefits constituted an abuse of its discretion.

## II.    LEGAL STANDARD

A motion for summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If there is no genuine dispute as to any material fact, it is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted). However, if the court finds that there *is* a genuine issue of material fact, the motion must be denied. 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2720 (3d ed. 2011).

A court must look to the specific facts pled to determine whether a triable issue exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1996). The moving party bears the burden of establishing the nonexistence of a triable issue of fact by "showing—that is, pointing

out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325 (internal quotation marks omitted). "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict." *Anderson*, 477 U.S. at 252.

A district court must "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citations omitted). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. "Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates the other party should win as a matter of law." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir. 2006). Thus, if the nonmoving party's evidence is only colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 at 249–50.

## III.   DISCUSSION

Because the material facts are undisputed in this case, summary judgment is appropriate if Wells Fargo is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Under controlling authority and the terms of the Plan, benefits decisions by Liberty and Wells Fargo are entitled to deference from this Court and may only be overturned if they constitute an abuse of discretion. Because the record provides some support for the Committee's denial of STD benefits, the Court cannot find it was an abuse of discretion and, accordingly, grants the Motion for Summary Judgment.

### A.   STANDARD OF REVIEW

In a denial of benefits challenge under ERISA, this Court is required to apply the deferential "abuse of discretion" standard to decisions by a plan administrator where the plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Stanley v. Metro. Life Ins. Co.*, 312 F. Supp. 2d 786, 789

(2004) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). The parties agree that the abuse of discretion standard is applicable to the Committee's decision. The Committee is an entity of Wells Fargo & Company, which the Plan expressly designated to be the Plan administrator, vested with "full discretionary authority to administer and interpret" the Plan and with authority to "delegate its duties and discretionary authority to certain designated personnel and third parties." (Admin. R. WF-1000478).

The Fourth Circuit has made clear that the abuse of discretion standard "equates to reasonableness" and is less deferential than the arbitrary and capricious standard. *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (citing *Firestone*, 489 U.S. at 111; *Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 342 (4th Cir. 2000)). The Court considers eight nonexclusive factors in determining whether a plan administrator's decision was reasonable:

> (1) The language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the material considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretation of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth*, 201 F.3d at 342-43. The Committee's decision to deny STD benefits to Harrison must be upheld unless, under the rubric set forth in *Booth*, its decision was an unreasonable abuse of discretion.

B. DENIAL OF HARRISON'S STD BENEFITS

While the administrative record provides some subjective support in favor of Harrison's incapacity, objective indications of her physical and psychological limitations are severely lacking in the administrative record. To determine whether denial of benefits was a reasonable decision resulting from a reasoned and principled process, the Court must assess Wells Fargo's consideration of the administrative record, applying the deferential abuse of discretion standard. *Firestone*, 489 U.S. at 115. In the absence of any objective indicators—and conflicting

11

subjective indicators—of the severity of Harrison's conditions, the Court cannot find Wells Fargo's decision to deny Harrison STD benefits to be an abuse of discretion.

As an initial matter, the scope of this Court's inquiry and burden of proof must be defined. First, Harrison's thyroid complication is properly assessed as a single, ongoing medical condition for three reasons: (1) Liberty documented Harrison's claim for STD benefits as "thyroid surgery and thoracic surgery" and was initiated after hospitalization for generalized chest pains; (2) from a medical standpoint, Harrison's diagnosis was for a thyroid mass that was removed in multiple surgeries for safety, rather than because of recurrence; and (3) Harrison actively chose to pursue her STD claim as a single diagnosis, rather than as multiple surgeries.[5] Second, the parties appear to agree that Harrison carries the burden to prove that Wells Fargo's denial decision was unreasonable, either procedurally or substantively. *See De Nobel v. Vitro Corp.*, 885 F.2d 1180, 1186 (1989) ("[R]eviewing courts may disturb the challenged denial of benefits only upon a showing of procedural or substantive abuse.").

The administrative record provides support for three different medical conditions that, if sufficiently disabling, could have justified STD benefits under the Plan: Harrison's rotator cuff injury, Harrison's psychological difficulties, and Harrison's thyroid condition (including both the thyroid itself and the chest mass). Because any of these medical conditions—or all of them in

---

[5] Considering Harrison's medical condition as unitary strengthens her argument. If Harrison's conditions were considered as a thyroidectomy and a subsequent, separate sternotomy, there would be significantly less support in the administrative record for a finding that Harrison's medical condition continued between September 11, 2011, and the date of Harrison's sternotomy. Specifically, the administrative record indicates that Harrison's thyroidectomy was successful, she had no post-operative complications, and healing time for a thyroidectomy is approximately two weeks.

  The parties do not argue directly whether Harrison's injury was unitary or divisible, but it can be read into Harrison's first argument that Wells Fargo unreasonably concluded Harrison was "fully recovered" as of September 10, 2011. There is some support for this argument because Wells Fargo relied, at least in part, on Dr. Gerstenblitt's assessment that Harrison "had recovered fully from her thyroidectomy." In isolation, sole reliance on this point to deny Harrison benefits could be construed as an abuse of discretion, particularly in light of the medical documentation showing that Harrison continued to experience chest pain, shortness of breath, and stenosis in her trachea and inferior vena cava. However, Wells Fargo's denial letter of May 4, 2012, indicates that Harrison's claim was ultimately denied because Harrison failed to support her claim with medical evidence showing that she was unable to perform her essential job duties. It appears to have been the failure to prove the *severity* of Harrison's ongoing symptoms, rather than the *existence* of those symptoms, that led Wells Fargo to deny the STD benefits claims. As such, Wells Fargo's decision did not solely rely on Harrison's recovery from the thyroidectomy and, therefore, cannot be deemed an abuse of discretion on that basis.

combination—could have provided the basis for a successful STD claim under the Plan, each of them will be addressed in turn and to assess whether Harrison has shown Wells Fargo's denial decision was unreasonable.

### 1. Rotator Cuff Injury

The administrative record indicates that Harrison's first complaint of shoulder pain occurred subsequent to her thyroidectomy. Dr. Petrizzi noted the injury in Harrison's office visit on September 9, 2011, but did not specify any restrictions or limitations on Harrison's functional abilities. The NCM explicitly recognized this injury in her review of Harrison's claim and, apparently without reference to Harrison's job duties, determined that the injury required several physical restrictions and limitations. In its initial denial of Harrison's claim for STD benefits, Liberty noted that the restrictions and limitations imposed by Harrison's rotator cuff injury as determined by the NCM would not interfere with her ability to perform the essential functions of her job. The record supports this determination, and Harrison does not articulate how her rotator cuff injury would have precluded her from performing the essential duties of her job. As such, Harrison has failed to show that denial of STD benefits on the basis of a rotator cuff injury was an abuse of Wells Fargo's discretion under the Plan.

### 2. Psychological Difficulties

Similarly, Harrison has not carried her burden to prove that Wells Fargo unreasonably denied STD benefits on the basis of psychological impairment. The administrative record indicates that Harrison first reported psychological problems at an office visit with Dr. Petrizzi on August 4, 2011. The entirety of the evidence before Liberty prior to its initial denial of STD benefits was this report of variable onset depression "described as feeling lack of joy/happiness." (Admin. R. WF-1000085). Dr. Petrizzi responded to this complaint by increasing Harrison's Lexapro dosage and no complaint of depression or anxiety was reported by Harrison until after

Liberty denied her STD claim on September 16, 2011.[6] Without any evidence or information indicating that Harrison's psychological problems precluded her from performing her job duties, Liberty's initial denial of STD benefits cannot be found unreasonable either substantively or procedurally.

During the appeals process, however, Harrison did provide some subjective evidence of psychological impairment, which Wells Fargo appears to have considered and rejected. Shortly after Liberty notified Harrison of their denial of STD benefits, Harrison had another office visit with Dr. Petrizzi, at which she complained of anxiety. Dr. Petrizzi diagnosed her with anxiety, referred her to Dr. Glenn, and wrote a letter in which he opined that Harrison's chest pain, "continued difficulty with most activities," and "significant anxiety" collectively prevented her from returning to desk work.[7] (Admin. R. WF-1000097.)

Importantly, Dr. Petrizzi appears to have deferred Harrison's treatment entirely to Dr. Glenn, and neither Harrison nor Dr. Glenn ever provided objective medical documentation to support the conclusion that Harrison's anxiety made her unable to perform her job duties. In his letter of October 6, 2011, Dr. Petrizzi noted that Dr. Glenn would be handling Harrison's psychological treatment. Dr. Petrizzi never provided treatment to Harrison for her reported anxiety, never objectively tested Harrison for psychological impairment or functional limitations, and provided no grounds other than Harrison's self-reporting for his diagnosis.

In handling Harrison's appeal, Liberty repeatedly indicated to Harrison that she was required to provide all documentation supporting her claims for STD benefits. Multiple letters provided by Liberty to Harrison indicated that "[f]ailure to provide additional medical

---

[6] Wells Fargo implies that Harrison's psychological claims are suspect because she did not assert them until her STD claim was denied. This argument is unpersuasive in light of the facts that (1) Harrison's psychological issues admittedly did not arise until the death of her husband, subsequent to her initial claim for STD benefits and (2) Harrison complained of psychological problems in an office visit on August 4, 2011, prior to the initial denial of her STD benefits.

[7] This contention is somewhat contradicted by the contemporaneous office visit report which indicates that Dr. Petrizzi intended to "write a letter in support of [Harrison's] continued STD due to her continued chest pain." (Admin. R. WF-1000111.)

information . . . may result in the closure of [a] claim" and denial of further benefits. (Admin. R. WF-1000130, 138, 148). Additionally, Liberty documented several phone conversations with Harrison, all indicating that she was aware of her burden of production and, on October 21, 2011, confirming that she had provided all relevant documentation in support of her claims. Finally, Harrison indicated in her second-level appeal letter, dated December 15, 2011, that she had been treated by two new providers, Dr. Glenn and Dr. Hollings. Plaintiff submitted, and the Committee and peer reviewers considered, a letter written by Dr. Hollings. Harrison did not, however, submit any additional documentation from Dr. Glenn.

Harrison's argument that Wells Fargo's denial of benefits was procedurally unreasonable for its failure to seek out psychological records is unavailing. At the hearing held on October 31, 2013, Harrison's counsel suggested that Liberty's decision to contact Dr. Petrizzi, but not Dr. Glenn, constituted an unreasonable process. The Court disagrees. To the extent that Harrison relies on changes in Liberty's willingness to actively obtain medical documentation, Harrison is essentially asserting a claim of equitable estoppel. To wit, having assumed the burden of production despite the plain language of the Plan, Wells Fargo cannot now assert that Harrison solely bears the burden of production. This argument fails because the Fourth Circuit has unequivocally stated that principles of estoppel cannot be used to alter the written terms of an ERISA benefits plan. *See HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1010 (4th Cir. 1996); *see also White v. Provident Life & Accident Ins. Co.*, 114 F.3d 26, 28 (4th Cir. 1997) ("ERISA demands adherence to the clear language of [the] employee benefit plan.").

Similarly unpersuasive is Harrison's reliance on Tenth Circuit precedent. In *Gaither v. Aetna Life Insurance Company*, the Tenth Circuit appears to have adopted a rule that an ERISA administrator must seek out and consider "readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory." 394 F.3d 792, 807 (10th Cir. 2004). The Tenth Circuit's reasoning, while sound, is not controlling precedent in this

Court. ERISA administrators in the Fourth Circuit have no duty to seek out additional information supporting a claim where the record contains evidence supporting denial. *See Elliott v. Sara Lee Corp.*, 190 F.3d 601, 608 (4th Cir. 1999) (citing *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1008 (4th Cir. 1985)). This case does not fall neatly under either rule; the administrative record is, with the exception of Dr. Petrizzi's conclusory diagnosis of anxiety and Harrison's self-reported troubles, completely devoid of evidence supporting either approval or denial of benefits on the basis of psychological impairment.[8]

Under the *Booth* factors, however, Wells Fargo's denial of benefits for psychological impairment cannot be deemed unreasonable. The third *Booth* factor requires the Court to consider the adequacy of the material considered by an ERISA benefits administrator and the degree to which it supports the decision. *Booth*, 201 F.3d at 342. Arguably in this case, the material considered by Wells Fargo was lacking, as was the material provided by Harrison. However, the first *Booth* factor requires the Court to consider the reasonableness of Wells Fargo's actions in light of the language of the Plan itself. *Id.* In this case, the Plan places the burden of production squarely on the Plan beneficiary. It states, "Proof of your disability is required for all claims and must be received by Liberty within the designated time frame. . . . If Liberty has not received proof within the designated time frame, your request for STD benefits will be denied." (Admin. R. WF-1000453.) The Court finds that, were it to rule in Harrison's favor on the basis of the third *Booth* factor alone, it would impermissibly shift the burden of production from Harrison to Wells Fargo, in derogation of the plain language of the Plan. As such, the first *Booth* factor weighs more heavily in this case.

Harrison asserts that Dr. Petrizzi's letter dated October 5, 2011, should be sufficient evidence of psychologically-based functional limitation. However, the Plan gives Liberty

---

[8] Dr. Daniel's peer review is not properly considered as anything other than a confirmation that the record lacked evidence regarding Harrison's psychological impairment. He concludes his report by asserting that "an opinion as to whether [Harrison's] psychiatric status limited her functional capacity cannot be provided." (Admin. R. WF-1000368).

discretion to determine what constitutes sufficient proof: "Proof may include medical records, test results, or hospitalization records as Liberty deems necessary." (Admin. R. WF-1000453.) In light of the fact that Harrison's psychological condition did not manifest itself until after her STD benefits were discontinued, it was not unreasonable for Liberty to require more proof of Harrison's condition than Dr. Petrizzi's conclusory letter. Liberty encouraged Harrison to provide as much supporting documentation as possible. Additionally, in denying Harrison's first appeal, Liberty indicated that Dr. Petrizzi's letter was insufficient to support a claim for benefits. Nevertheless, Harrison declined to provide additional information to the Committee during her second appeal. Having failed to meet her burden under the Plan or provide supplemental medical evidence in support of a claim for psychological impairment, Harrison cannot now charge Wells Fargo with having made an unreasonable determination based on inadequate information. *Cf. Elliott*, 190 F.3d at 608. For the foregoing reasons, the Court cannot deem Wells Fargo's determination that the record failed to support psychologically-based functional impairment to be an unreasonable abuse of discretion.

### 3. Thyroid Condition

Harrison finally argues that Wells Fargo's denial of STD benefits was unreasonable in light of Harrison's continuing complaints of chest pain and shortness of breath, which were supported both by her reports and evidence provided by her treating physicians. However, in reviewing the record as a whole, and particularly Harrison's own descriptions of her condition prior to Liberty's initial discontinuation of STD benefits, the Court cannot deem Wells Fargo's discretionary benefits determination to be unreasonable. Further, Harrison has failed to prove that Wells Fargo's denial of benefits was unreasonable for selectively parsing the record, for relying on independent peer-reviewers, for disregarding testimonial evidence, or for failing to distinguish between Harrison's inability to perform "some" or "all" of her essential job duties.

As an initial matter, it is important to note that the Wells Fargo based its denial of STD benefits only on Harrison's ability to work between September 11, 2011, and the date of

17

Harrison's sternotomy. Wells Fargo asserts this distinction in its submissions to the Court. Additionally, Dr. Gerstenblitt indicated in his independent peer review that Harrison likely would have been eligible for STD benefits subsequent to her sternotomy, but was not physically limited in the weeks prior. Harrison argues that no treating physician ever released Harrison back to work; however, Harrison also cites to no authority requiring a treating physician to release a patient as a prerequisite to denial of benefits.[9] Rather, the case law indicates that the reasonableness of an administrator's decision is based on the language of the Plan itself, and the administrator's review of all facts and evidence available at the time a discretionary decision is made. *See Booth*, 201 F.3d at 342-43.  As such, analysis of Harrison's physical condition is properly limited to the time between September 10, 2011, and October 31, 2011.

As with Harrison's reported psychological condition, there is a distinct lack of objective medical evidence in the record to guide a determination of whether Harrison suffered from physical limitations precluding her from working after September 10, 2011. The only objective evidence in the record appears to be Dr. Hollings's letter, which was not available to Wells Fargo until Harrison's second-level appeal to the Committee. Dr. Hollings indicates that subsequent to Harrison's thyroidectomy, she continued to experience stenosis of the trachea and inferior vena cava as a result of the continued presence of a mass in her chest. This objective information is consistent with decreased air and blood flow, of which chest pain and shortness of breath are likely symptoms. This objective evidence is also consistent with Harrison's continued complaints of chest pain and shortness of breath following her thyroidectomy.

However, in making its determination, the Committee had to resolve conflicting information regarding the severity of Harrison's symptoms in order to determine whether

---

[9] Additionally, at least one court in the Fourth Circuit has found that a generalized statement indicating that an individual cannot work is inconclusive as to whether that individual can perform sedentary work. *See Briggs*, 368, F. Supp. 2d at 470 n.8. This is particularly applicable to Harrison's situation, in which the treating physicians made generalized recommendations that Harrison not work, but failed to limit in any way Harrison's activity at home. Dr. Gerstenblitt's review appears to pick up on this lack of limitation as support for his conclusion that Harrison was not functionally limited with regard to sedentary work and that her chest pain was "not necessarily" a disabling condition.

Harrison was unable to perform her essential job duties and, therefore, eligible for benefits under the Plan. This conflicting subjective information included the opinion and recommendations of Harrison and her treating physicians, on one hand, and subjective information from Dr. Gerstenblitt and Harrison herself, on the other. The Fourth Circuit has made clear that "it is not an abuse of discretion for a plan fiduciary to deny disability pension benefits where conflicting medical reports [are] presented." *Elliott*, 190 F.3d at 606 (citing *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 234 (4th Cir. 1997); *Brogan v. Holland*, 105 F.3d 158, 162-63 (4th Cir. 1997)).

Wells Fargo apparently found the subjective evidence favoring denial of benefits more persuasive than that favoring approval. For example, Dr. Gerstenblitt noted in his independent peer review that chest pain was not "necessarily" a disabling condition. Although far from a medical conclusion, this statement indicates that the severity of Harrison's symptoms was at issue. Harrison indicated that her symptoms were improved subsequent to her thyroidectomy. Additionally, on October 10, 2013, Harrison described her chest pain to Dr. Petrizzi "as a discomfort." (Admin R. WF-1000095). Finally, Wells Fargo appears to have found persuasive the fact that none of Harrison's treating physicians recommended at-home limitations or noted specific occupational restrictions and limitations for Harrison. In contrast, Harrison cites to her treating physicians' generalized recommendations of not working, and testimonial evidence provided Harrison and her sister.[10]

The record, therefore, indicates that Harrison likely suffered some symptoms after she healed from the thyroidectomy, or subsequent to September 10, 2011; however, there is conflicting, subjective evidence in the record as to whether those symptoms were so severe that

---

[10] Wells Fargo indicates that the Committee considered Harrison's testimonial evidence in denying benefits. However, the Plan unequivocally requires medical records, test results, hospitalization records, prescription records, and the like to qualify for STD benefits. Additionally, Wells Fargo correctly points out that the testimony of Harrison's sister does not distinguish between the time before or after Harrison's sternotomy, and it appears to be largely consistent with the limitations expected as a result of Harrison's second surgery. The primary exceptions to this observation are (1) testimony regarding Harrison's arm and rotator cuff injury, which Harrison does not seriously argue qualified her for STD benefits under the Plan, and (2) Harrison's refusal to drive, which was not a limitation imposed or recommended by any physician to have reviewed Harrison's conditions.

Harrison was unable to perform some or all of her essential job duties. In light of these facts, the Court cannot find Wells Fargo abused its discretion as a matter of law. As the Fourth Circuit has noted,

> At its immovable core, the abuse of discretion standard requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance. . . . [T]he abuse of discretion standard . . . like other such standards, bites mainly in close cases, [where a court] should . . . acknowledge[] the essential equipoise and stay[] its hand.

*Evans*, 514 F.3d 322, 325.

Harrison's final four arguments similarly fail. First, Harrison has failed to demonstrate how Wells Fargo selectively parsed the medical evidence in favor of evidence supporting its decision to deny benefits. The Committee's final denial letter explained that all of the evidence submitted by Harrison was reviewed by the Committee and by Dr. Gerstenblitt in his independent peer review. For the reasons stated in the foregoing paragraphs, the Court cannot find abusive Wells Fargo's discretionary decision to find certain evidence and documentation more persuasive purely because it was unfavorable to Harrison. Second, Harrison's argument impugning Dr. Gerstenblitt's independent peer review lacks legal merit. The Supreme Court has unequivocally rejected a treating physician rule and, therefore, Dr. Gerstenblitt's medical opinion cannot be discounted purely because he did not personally treat Harrison. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831-32, 834 (2003). Third, Harrison has failed to demonstrate both that Wells Fargo was required to consider testimonial evidence and also that Wells Fargo disregarded the submitted testimonial evidence. *See supra* note 10. Fourth and finally, Harrison's argument that Wells Fargo's "failure to analyze the 'some' aspect of the Plan's qualification for benefits is unreasonable" lacks merit. The Committee's final denial letter indicates that Harrison failed to carry her burden to prove that she was functionally limited in performing *any* of her essential job duties.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment.

Let the Clerk send a copy of this Memorandum to all counsel of record. An appropriate Order will accompany this Memorandum Opinion.

It is SO ORDERED.

_____/s/_____
James R. Spencer
United States District Judge

ENTERED this ___8th___ day of November 2013.

21